**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————

ROBERT SNYDER,

                                    Plaintiff,                    No. 1:19-CV-1085
                                                                        (CFH)

                    v.

WILLIAM FISH and
CHRISTOPHER LUBRANT,

                                    Defendants.

———————————————————

**APPEARANCES:**                          **OF COUNSEL:**

Breedlove, Noll, LLP                      BRIAN BREEDLOVE, ESQ.
82 Glenwood Avenue                        CARRIE MCLOUGHLIN NOLL, ESQ.
Queensbury, New York 12804
Attorneys for plaintiff

Attorney General for the                  CHRISTOPHER LIBERATI-CONANT
State of New York                         ESQ.
The Capitol                               AMANDA K. KURYLUK, ESQ.
Albany, New York 12224                    Assistant Attorneys General
Attorneys for defendants

### MEMORANDUM-DECISION & ORDER[1]

### I. Background

On August 30, 2019, plaintiff Robert Snyder ("plaintiff") commenced this action

against defendants New York State Troopers William Fish ("Trooper Fish") and

Christopher Lubrant ("Trooper Lubrant") (collectively, where appropriate, "defendants"),

pursuant to 28 U.S.C. § 1983, asserting violations of his constitutional rights, as well as

---

[1] The parties have consented to magistrate jurisdiction over this matter, including entry of judgment, pursuant to 28 U.S.C. § 636.  See Dkt. Nos. 19, 22.

various state law torts.  See generally Dkt. No. 1; Dkt. No. 44 ("Am. Compl.").  Presently before the Court is defendants' motion for summary judgment filed pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56.  See Dkt. No. 41. Plaintiff has filed a response.  See Dkt. Nos. 45-47.  Defendants have filed a reply.  See Dkt. No. 48.

As an initial matter, after defendants filed the instant motion, plaintiff withdrew his Third and Fourth Causes of Action completely, as well as his Second Cause of Action, in part.  See Dkt. No. 46 at 19; see also Am. Compl. at 11-15 ¶¶ 66-89.  Those claims alleged violations of his constitutional rights relative to his First Amendment right to free speech, Eighth Amendment deliberate indifference to serious medical needs, and Fourth Amendment unlawful search and seizure.  See Am. Compl. at 11-15, ¶¶ 66-89.  Thus, the remaining claims include plaintiff's First Cause of Action (Section 1983 excessive force), Fifth Cause of Action (state law false arrest), Sixth Cause of Action (state law assault and battery), Seventh Cause of Action (state law negligence), and the remaining portion of plaintiff's Second Cause of Action (Section 1983 false arrest).[2]  An additional, unnumbered cause of action asserting a Section 1983 failure to intervene claim relative to the excessive force claim is also addressed.  See id. at 6, 8, ¶¶ 35, 52.  For the following reasons, defendants' motion for summary judgment is granted in part and denied in part.

---

[2] On March 15, 2022, after defendants submitted their motion, plaintiff filed an Amended Complaint upon stipulation of the parties, correcting certain mistakes as to the identity of each defendant.  See Am. Compl.; Dkt. No. 46 at 1, 19.  The Court will not consider the portions of the Amended Complaint referring to the causes of action plaintiff subsequently withdrew.

## II. Summary Judgment Standard

Summary judgment is warranted if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  (citations omitted).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citations omitted).j

The moving party bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  See Salahuddin v. Goord, 467 F.3d 263, 272-72 (2d Cir. 2006).  To meet this burden, the moving party can demonstrate that the non-movant has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotext Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-movant

> bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings.

Salahuddin, 467 F.3d at 272-73 (citing Celotex, 477 U.S. at 323 (citations omitted)).

Where the moving party satisfies its burden "in either manner," the non-movant must "point to record evidence creating a genuine issue of material fact."  Salahuddin, 467 F.3d at 273 (citations omitted).  However, the non-moving party must do more than

"simply show that there is some metaphysical doubt as to the material facts."
Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
Likewise, "[c]onclusory allegations, conjecture and speculation. . . are insufficient to
create a genuine issue of fact."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

      In determining whether a genuine issue of fact exists, the court must resolve all
ambiguities and draw all reasonable inferences against the moving party.  See Major
League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008).
Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's
position will be insufficient; there must be evidence on which the jury could *reasonably*
find for the plaintiff."  Jeffreys v. City of N. Y., 426 F.3d 549, 554 (2d Cir. 2005).  "At the
summary judgment stage, a nonmoving party must offer some hard evidence showing
that [his] version of the events is not wholly fanciful."  Id. (citations omitted).


### III. Discussion

### A. Undisputed Material Facts

      On the afternoon of September 1, 2018, plaintiff picked up his friend Jason
Hayes ("Jason") and Jason's son, Jake Hayes ("Jake"), as the two men planned to help
plaintiff clean out his barn in a rural wooded area in Schenectady County.  See Dkt. No.
41-1 at 1, ¶ 1; Dkt. No. 47 at 2, ¶ 1; Dkt. No. 41-7 at 23.  The Hayeses brought along
with them "a couple six packs of beer and a bottle of Bourbon."  Dkt. No. 41-1 at 1, ¶ 2;
Dkt. No. 47 at 2, ¶ 2.  Throughout the day and into the evening, plaintiff consumed
"approximately four beers and 'two' sips of Jameson."  Dkt. No. 41-1 at 2, ¶ 3; Dkt. No.

4

47 at 2, ¶ 2.  Sometime around midnight, while alone in the barn, plaintiff overheard an

argument outside between Jason and Jake.  See Dkt. No. 41-1 at 2, ¶ 4; Dkt. No. 47 at

2, ¶ 4.  After plaintiff left the barn, and upon "see[ing] what was going" (the details of

"what was going on" are unclear), plaintiff told Jake to leave.  Id. at Dkt. No. 41-1 at 2, ¶

5; Dkt. No. 47 at 2, ¶ 5.

Plaintiff noticed that Jason was injured, with "blood all over his shirt and 'blood

squirting out'" from his head.  Dkt. No. 41-1 at 2, ¶¶ 6-7; Dkt. No. 47 at 2, ¶¶ 6-7; Dkt.

No. 41-5 at 30; Dkt. No. 45-3 at 42-43.  Plaintiff then ran across the street to his home

to get his grandson to call 911.  See id.  Plaintiff returned to Jason and held a towel over

his wound.  See Dkt. No. 47 at 10, ¶ 45; Dkt. No. 48-1 at 1, ¶ 45.

Thereafter, at approximately 2:00 AM, defendants received a 911 dispatch call

for EMS assistance at plaintiff's property concerning the report of a possible assault.

See Dkt. No. 41-1 at 2, ¶ 8; Dkt. No. 47 at 2, ¶ 8; Dkt. No. 41-8 at 1.  Defendants drove

to the location together in a single patrol car.  See Dkt. No. 41-1 at 2, ¶ 8; Dkt. No. 47 at

2, ¶ 8; Dkt. No. 41-8 at 1.  When they arrived, Trooper Fish parked the car directly

behind an ambulance that was already on scene.  See Dkt. No. 41-1 at 2, ¶ 9; Dkt. No.

47 at 2, ¶ 9.  Near the ambulance, Trooper Fish observed EMS personnel tending to an

injured person.  See Dkt. No. 41-1 at 2, ¶ 9; Dkt. No. 47 at 2, ¶ 9.  He also noticed three

other individuals on the property, later identified as plaintiff's sons, Timothy Snyder and

Robert J. Snyder, and plaintiff's grandson, Connor Snyder.  See Dkt. No. 41-1 at 2, ¶

10; Dkt. No. 47 at 2-3, ¶ 10.

At some point, Trooper Fish went to talk to the person in the ambulance and

Trooper Lubrant approached plaintiff.  See Dkt. No. 41-1 at 2, ¶ 11; Dkt. No. 47 at 3, ¶

11.  At the ambulance, Jason identified himself to Trooper Fish.  <u>See</u> Dkt. No. 41-1 at 3, ¶ 12; Dkt. No. 47 at 3 ¶ 12.  As Jason was bleeding from the side of his head, Trooper Fish asked him what happened. <u>See</u> Dkt. No. 41-1 at 3, ¶ 13; Dkt. No. 47 at 3 ¶ 13. Jason told Trooper Fish that he had been drinking and fell.  <u>See id.</u>

Trooper Lubrant approached plaintiff, who had blood "on his arm and stuff."  Dkt. No. 41-1 at 3, ¶ 14; Dkt. No. 47 at 3, ¶ 14.  However, plaintiff had no injuries of his own. <u>See</u> Dkt. No. 47 at 11, ¶ 49; Dkt. No. 48-1 at 1, ¶ 49.  Trooper Lubrant asked plaintiff what was going on.  <u>See</u> Dkt. No. 41-1 at 3, ¶ 18; Dkt. No. 47 at 3, ¶ 18.  At some point while speaking with Trooper Lubrant, "plaintiff ceased being cooperative."  Dkt. No. 41-1 at 3-4, ¶¶ 19, 21-22; Dkt. No. 47 at 6-8, ¶¶ 19, 21-22.  When plaintiff ceased being cooperative and asserted his right to a lawyer, Trooper Lubrant proceeded to handcuff him.  <u>See</u> Dkt. No. 41-1 at 4, ¶¶ 19, 21-22; Dkt. No. 47 at 7-8, ¶¶ 19, 21-22.

Once handcuffed, Trooper Lubrant walked plaintiff down to the patrol car.  <u>See</u> Dkt. No. 41-1 at 4, ¶ 23; Dkt. No. 47 at 8, ¶ 23.  Trooper Lubrant remained behind plaintiff with "his right arm in [p]laintiff's right arm and his left arm in [p]laintiff's arm all while [p]laintiff's arms were handcuffed behind his back."  <u>Id.</u>  Before reaching the car, plaintiff's pants fell down to his ankles.  <u>See</u> Dkt. No. 41-1 at 4, ¶ 24; Dkt. No. 47 at 8, ¶ 24.  Ultimately, plaintiff fell to the ground on his face.  <u>See id.</u>  Trooper Lubrant then picked plaintiff up.  <u>See</u> Dkt. No. 41-1 at 4, ¶ 25; Dkt. No. 47 at 8, ¶ 25.

After speaking with Jason, Trooper Fish went to move his car out of the way to allow the ambulance to get by.  <u>See</u> Dkt. No. 41-1 at 4, ¶ 27; Dkt. No. 47 at 9, ¶ 27.  As Trooper Fish started walking back up to the scene, he saw Trooper Lubrant walking plaintiff toward the patrol car.  <u>See</u> Dkt. No. 41-1 at 4, ¶ 28; Dkt. No. 47 at 9, ¶ 28.

While the two men approached the patrol car, Trooper Fish noticed plaintiff was in handcuffs with both hands behind his back as Trooper Lubrant followed from behind. See Dkt. No. 41-1 at 4, ¶ 29; Dkt. No. 47 at 9, ¶ 28.  Plaintiff appeared to be struggling as his pants had fallen to his ankles.  See Dkt. No. 41-1 at 4-5, ¶ 30; Dkt. No. 47 at 9, ¶ 30.

When plaintiff and Trooper Lubrant reached the patrol car, Trooper Fish opened the backdoor on the passenger side.  See Dkt. No. 41-1 at 5, ¶ 31; Dkt. No. 47 at 9, ¶ 31.  Plaintiff proceeded to sit down on the backseat with his legs facing out of the vehicle. See id.  Trooper Lubrant noticed that plaintiff had a cut on his head, which he then treated with gauze.  See Dkt. No. 41-1 at 5, ¶ 32; Dkt. No. 47 at 9, ¶ 32.

Following his fall, plaintiff lost consciousness for a period of time.  See Dkt. No. 41-1 at 6, ¶ 38; Dkt. No. 47 at 10, ¶ 38.  After defendants completed searching the area, plaintiff was released to his sons.  See Dkt. No. 45-2 at 33-34; Dkt. No. 41-6 at 44-45; Dkt. No. 45-1 at 46-48.  Plaintiff did not fall again or sustain any additional injuries.  See Dkt. No. 47 at 11, ¶ 50; Dkt. No. 48-1 at 1, ¶ 50.

After defendants left the scene, plaintiff's family called 911 again due to apparent injuries to plaintiff's arm.  See Dkt. No. 45-1 at 48-49; Dkt. No. 45-2 at 43-45.  At approximately 3:15 AM, a second ambulance returned to the scene to assess complaints from plaintiff about pain in his left elbow.  See Dkt. No. 41-1 at 6, ¶¶ 39-40; Dkt. No. 47 at 10, ¶¶ 39-40.  Plaintiff does not remember anything after falling on his way to the patrol car until the second ambulance arrived.  See Dkt. No. 41-1 at 5-6, ¶ 36; Dkt. No. 47 at 10, ¶ 36.  Plaintiff was taken to Bassett Hospital and subsequently diagnosed with a left elbow fracture requiring surgery.  See Dkt. No. 41-1 at 6, ¶¶ 43-44;

Dkt. No. 47 at 10, ¶¶ 43-44.  At no point did plaintiff assault anyone or otherwise commit a crime.  See Dkt. No. 47 at 11, ¶ 55; Dkt. No. 48-1 at 2, ¶ 55.

## B. Parties' Arguments

### 1.  Defendants' Arguments

Defendants' summary judgment motion seeks to dismiss plaintiff's complaint in its entirety.  See Dkt. No. 41 at 1.  Defendants argue that plaintiff cannot establish a genuine issue of material fact and that the record demonstrates that they did not violate plaintiff's constitutional rights.  See Dkt. No. 41-10 at 3.  Defendants contend that the Court should decline exercising supplemental jurisdiction over any remaining state law claims.  See id. at 3-4.  In the alternative, defendants argue that dismissal is warranted because defendants are entitled to qualified immunity from suit.  See id. at 4.

Defendants' first argument addresses the excessive force claim.  See Dkt. No. 41-10 at 9-10.  Defendants argue that the right to make an arrest or detain a suspect accompanies inherent authority to use some degree of physical force, including the use of handcuffs.  See id. at 10.  They cite authorities indicating that injuries from handcuffing, such as "short-term pain, swelling, bruising, and numbness," cannot support an excessive force claim.  Id. (citations omitted).  As to the claim against Trooper Fish, defendants cite admissible record evidence indicating that he never made physical contact with plaintiff and that, to the extent he was involved in plaintiff's "temporary detainment," his involvement was limited only to "opening the passenger door of the patrol vehicle."  Dkt. No. 41-10 at 10-11.  Accordingly, they argue, Trooper

Fish cannot be liable for excessive force due to his lack of personal involvement.  See id.

Like their excessive force argument in support of Trooper Fish, defendants contend that any false arrest claim as to Trooper Fish must be dismissed based on his lack of personal involvement.  See Dkt. No. 41-10 at 13.  Defendants point out that, "by the time [Trooper Fish] had walked back up to the scene after moving his patrol vehicle," plaintiff was already in handcuffs being escorted by Trooper Lubrant.  Id. at 13-14.

On the other hand, however, defendants acknowledge that Trooper Lubrant used force upon plaintiff when he placed him in handcuffs and escorted him to the patrol car. See Dkt. No. 41-10 at 11-12.  While they concede that plaintiff fell as he was being escorted, defendants contend this occurred because he tripped on his pants as they fell to his ankles.  Id.  Defendants assert Trooper Lubrant did not "lift [plaintiff] up by his handcuffs"; rather, Trooper Lubrant grabbed him by his arms when helping him up.  Id. at 12.  Likewise, they assert that Trooper Lubrant neither "hit" plaintiff nor "thr[e]w him against the patrol car."  Id.  To support this contention, they point out that plaintiff admitted during his deposition that he cannot recall being hit or thrown against the patrol car, thus he lacks admissible evidence to support his claim.  See id.  On the whole, defendants argue that the force Trooper Lubrant admittedly used upon plaintiff was objectively reasonable.  See id. at 10-12.

As to the false arrest claim against Trooper Lubrant, defendants argue that his decision to "temporarily detain" plaintiff was supported by "probable cause" based on his observations of "[Jason] covered in blood" and plaintiff being "the only other person at

9

the scene. . .  covered in blood." Dkt. No. 41-10 at 14.  In further support of the probable cause determination, defendants argue that plaintiff appeared to be "highly intoxicated" and "slurring his words."  Id.  They claim that when Trooper Lubrant tried to question plaintiff, he became combative and refused to cooperate.  See id.  Defendants further contend that "exigent circumstances" justified detaining plaintiff considering Trooper Lubrant "observed a trail of blood on the property" and, after following the trail, he discovered "a shed where he saw a bloody hammer and an empty bottle of whiskey lying on the ground in plain sight."  Id. at 14-15.  Based on these alleged cumulative observations, defendants assert that Trooper Lubrant "felt it was necessary to temporarily detain [p]laintiff for his own safety and the safety of everyone else until he could complete his investigation."  Id.

Moreover, defendants assert that they are entitled to qualified immunity, arguing that no reasonable officer of reasonable competence could disagree as to the legality of the alleged conduct.  See Dkt. No. 41-10 at 21.  Defendants also request that the Court decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims for false arrest, assault and battery, and negligence.  See id. at 22.  Notwithstanding, defendants argue that plaintiff's assault, battery, and false arrest claims are substantively meritless based on the same reasons and authorities supporting dismissal for the Section 1983 claims.  See id. at 22-23.  Relative to plaintiff's negligence claim, however, defendants argue this claim must be dismissed because the conduct at-issue is alleged to have been intentional, and that if intentional offensive conduct is established, the actor is liable for assault, not negligence.  See id. at 23-24.  Finally,

10

defendants assert that, to the extent they are sued in their official capacities, they are immune from suit under the Eleventh Amendment.  See id. at 24.

In their reply memorandum of law, defendants state that plaintiff "concedes in his opposition papers that at no point in time did Trooper Fish touch or use excessive force[.]"  Dkt. No. 48 at 5.  Defendants argue that any claim premised on Trooper Fish's "failure to intervene" should not be allowed to proceed because the complaint "failed to plead a cause of action for failure to intervene."  Id.  Nonetheless, defendants contend that "Trooper Fish did not participate in handcuffing [plaintiff] and was not in any way involved in escorting [him] to the patrol car."  Id. at 6.  Furthermore, defendants contend that the record is devoid of evidence establishing Trooper Fish had "a realistic opportunity to intervene and prevent harm or that he was aware that [plaintiff's] constitutional rights were being violated[.]"  Id.

Concerning Trooper Lubrant, defendants argue that his deposition testimony and sworn declaration establish that handcuffing and escorting plaintiff to the patrol car "in order to conduct a search of the property" was reasonable.  Dkt. No. 48 at 7. Defendants assert that allowances are required to be made for police officers' actions because they are often forced to make "split-second judgments" in circumstances that are "tense, uncertain, and rapidly evolving."  Id.  Defendants emphasize that plaintiff was the only person "covered in blood in conjunction with the fact that [he] had become combative and uncooperative, was slurring his words, and was stumbling around the property."  Id.  Defendants categorically dispute that Trooper Lubrant ever hit, punched, or struck plaintiff.  See id. at 8.

Defendants counter plaintiff's lack of probable cause argument by contending that his purported "intoxicat[ion]" and request for an attorney were not the sole factors prompting Trooper Lubrant to detain him.  Dkt. No. 48 at 9.  Rather, defendants justify the detention based on plaintiff's combativeness, refusal to answer questions, and the fact that he was the only other person covered in blood.  See id.  Defendants also claim Trooper Lubrant had "already discovered a trail of blood, a bloody hammer, and an empty whiskey bottle on the property," which contributed to Trooper Lubrant's concern for safety.  Id.  Defendants reiterate that, based on these latter "exigent circumstances," any false arrest claim should be dismissed.  Id.

### 2.  Plaintiff's Arguments

Plaintiff argues there are material questions of fact that warrant denying defendants' motion.  See Dkt. No. 46 at 3.  Plaintiff asserts that defendants ignore the sworn testimonies from multiple witnesses in this case, including his sons, Timothy Snyder and Robert J. Snyder, his grandson, Connor Snyder, and two EMT workers, Aaron Kellerman and Jessica Gathen, who were on scene when the incident occurred. See id. at 3-4.  He also contends that defendants "directly contradict each other on a variety of important material facts."  Id. at 4.

Relative to the alleged use of force, plaintiff clarifies that "Trooper Lubrant was the officer involved in handcuffing and striking the plaintiff.  Dkt. No. 46. at 12.  Plaintiff argues that "Trooper Fish was shadowing him and failed to intervene."  Id.  In this respect, plaintiff states that the purpose of amending his complaint was to "correct[] a

non-substantive error in the original complaint[:] The troopers' names were mistakenly transposed."  Id.

Plaintiff adduces admissible record evidence indicating that he was "cooperative and answered questions until he was accused of assault. . . [and] asserted his right to a lawyer." Dkt. No. 46 at 13.  He cites testimony from multiple witnesses indicating that Trooper Lubrant "handcuffed him and dragged him to the patrol car."  Id.  More specifically, he contends that "[w]itnesses testified that Trooper Lubrant handcuffed him behind his back, lifted him up by the handcuffs causing him pain, knocked him down on his face, picked him up by the handcuffs, wrists or forearms breaking his arm and dislocating his elbow, and then dragged to the patrol car."  Id.  Plaintiff counters defendants' argument that the alleged injuries are insufficient to support an excessive force claim by citing record evidence, including eyewitnesses and the parties' respective medical experts.  See id. at 15.  He also cites witness testimony calling into question whether he was "highly intoxicated" or trying to "flee the scene."  Id.  Plaintiff argues that the force used by Trooper Lubrant cannot be considered "objectively reasonable" under the circumstances.  Id. at 16.

As to Trooper Fish, plaintiff cites to the testimony of his son, Timothy Snyder, who characterized Trooper Fish as "shadowing" Trooper Lubrant when Trooper Lubrant used force on plaintiff.  Dkt. No. 46 at 16; Dkt. No. 45-1 at 39.  Plaintiff points out Trooper Fish's acknowledgment that he was present as plaintiff was placed into the patrol car.  See Dkt. No. 46 at 16.  Based on these allegations, plaintiff argues that Trooper Fish is liable for his "failure to intervene" as Trooper Lubrant violated plaintiff's constitutional rights.  Id.

In support of his false arrest claim, plaintiff argues that he was arrested—not merely detained.  See Dkt. No. 46 at 17.  He cites authorities showing that warrantless arrests are presumptively invalid and that defendants have failed to establish probable cause as a defense.  See id. (citations omitted).  Alternatively, plaintiff argues that to the extent he was "seized" or merely "detain[ed]," there are material issues of fact precluding summary judgment.  Id.

Furthermore, plaintiff argues that Trooper Lubrant initially told him that he was under arrest.  See Dkt. No. 46 at 17.  He disputes Trooper Lubrant's proffered "rationale" for arresting and/or detaining him, claiming that safety concerns or his purported attempt to flee the scene are "after the fact justification[s,]" and that the real motivation was retaliation against plaintiff "because he committed the cardinal sin of asking for a lawyer."  Id. at 18-19.  Plaintiff further points to the testimony of Trooper Lubrant and Trooper Fish, which plaintiff contends is contradictory as to the sequence of events.  See id. at 17-18.

Plaintiff disputes defendants' characterization of him being "covered in blood," but nonetheless acknowledges that he had blood on his "shirt," "arm," and "stuff."  Dkt. No. 46 at 5.  He also asserts that defendants spoke with plaintiff's sons and grandson before approaching the ambulance and Jason.  See id. at 6.  He disputes defendants' characterization that he was "intoxicated" and "slurring his words."  Id. at 8.  Although plaintiff acknowledges that he wanted to go into his house to sleep, he disputes defendants' characterization that he was trying to "flee the scene."  Id. at 8-9.  Plaintiff asserts that he was "arrested, taken into custody and placed into the patrol car **before** [Trooper] Lubrant searched the shed."  Id. at 9.  Moreover, he argues that, while

14

Trooper Lubrant may have found blood on the ground where Jason said he fell, there was no "blood trail" leading to the shed; nor was there a "bloody hammer" recovered, as indicated by the absence of any such documentation in Trooper Fish's incident report.[3] Id.

Finally, plaintiff argues that defendants are not entitled to qualified immunity because of the material factual disputes at-hand.  See Dkt. No. 46 at 19.  Furthermore, plaintiff states generally that he had a clearly established right to be "free from an unlawful arrest and the use of excessive force."  Id. at 20.  More specifically, he asserts that "[n]o officer would reasonably believe it is appropriate to handcuff someone because they asserted their right to counsel."  Id.  Plaintiff contends that his refusal to cooperate cannot be a basis for a detention or an arrest and that he had a "clearly established right to remain silent."  Id. at 14, 18-19.  Additionally, he asserts that "[n]o officer would reasonably believe that he could strike an elderly gentleman in the back while he was handcuffed, knock him to the ground on face, pick him up by the wrists or handcuffs breaking his arm and dislocating his elbow."  Id. at 20.

## IV. Analysis

### 1. Eleventh Amendment Immunity

---

[3] While not addressed in either party's briefing, the record evidence reveals that multiple witnesses state Jason was reportedly struck with a "pipe," not a "hammer."  Dkt. No. 45-3 at 31; Dkt. No. 45-4 at 9-10, 14, 41; Dkt. No. 41-6 at 33.  It is unclear whether plaintiff disputes that Trooper Lubrant ever found a "hammer" and that what he actually discovered was a "pipe," or whether he is disputing that Trooper Lubrant found a blunt object at all.  In viewing the facts in a light most favorable to plaintiff for the purposes of this motion, the Court assumes the latter.

The Eleventh Amendment "bars a damages action in federal court against a state and its officials when acting in their official capacity unless the state has waived its sovereign immunity or Congress has abrogated it." Dean v. Univ. of Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 193 (2d Cir. 2015) (citing Fulton v. Goord, 591 F.3d 37, 45 (2d Cir. 2009)); see also Will v. Mich. Dept. of the State Police, 491 U.S. 58, 64 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no difference from a suit against the State itself.") (citations omitted)).  Eleventh Amendment immunity applies whether the claims are asserted under the federal constitution or a court's pendent jurisdiction.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117-18 (1984).

To the extent plaintiff seeks to bring this action against defendants in their official capacities "as member[s] of the New York State Police[,]" such claims are barred by the Eleventh Amendment.  Dkt. No. 44.  The Eleventh Amendment does not, however, shield defendants from claims brought against them in their individual capacities.  See State Emp. Bargaining Agent Coal. v. Rowland, 718 F.3d 126, 137 (2d Cir. 2013).  Thus, while any claims asserted against defendants in their official capacities must be dismissed, all remaining claims not otherwise dismissed herein may proceed against defendants individually.

## 2.  Qualified Immunity

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" <u>City of Tahlequah v. Bond</u>, 142 S. Ct. 9, 11 (2021) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).  In examining whether a right is clearly established, courts look to prior precedent to determine if is "it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" <u>Rivas-Villegas v. Cortesluna</u>, 142 S. Ct. 4, 7 (2021) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).  "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" <u>City of Tahlequah</u>, 142 S. Ct. at 11 (quoting <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 590 (2018) (citations and internal quotations marks omitted)).  While prior caselaw need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." <u>Rivas-Villegas</u>, 142 S. Ct. at 7-8 (quoting <u>White v. Pauly</u>, 137 S. Ct. 548, 551 (2017) (internal quotations marks omitted)).

The Court addresses qualified immunity's applicability to plaintiff's false arrest and use of force claims under the relevant sections herein.

### 3.  False Arrest, Detention, & Imprisonment

"A claim for false arrest, detention or imprisonment is evaluated pursuant to the Fourth Amendment right to be free from unreasonable searches and seizures." <u>Waldron v. Milana</u>, No. 5:10-CV-0065 (NPM-DEP), 2012 WL 3929898, at *6 (N.D.N.Y. Sept. 10, 2012) (citations omitted) <u>aff'd</u> <u>by</u> 541 F. App'x 5 (2d Cir. 2013) (summary order).  "Claims for 'false arrest' and 'false imprisonment' are 'synonymous' under New

York law, and both are 'substantially the same as a 1983 claim for false arrest.'" Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (quoting Jackson v. City of N.Y., 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013)).  To establish a claim of false arrest, detention, or imprisonment, the plaintiff must "show that: '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012) (quoting Broughton v. State, 37 N.Y.2d 415, 456 (1975)).

"The general rule is that 'Fourth Amendment seizures are 'reasonable' only if based on probable cause' to believe that the individual has committed a crime." Mayes v. Village of Hoosick Falls, 162 F. Supp. 3d 67, 86 (N.D.N.Y. 2016) (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979)).  A police officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Oskt, 101 F.3d 845, 852 (2d Cir. 1996) (collecting cases).  "Probable cause 'is not a high bar'" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Dalessandro v. Cnty. of Nassau, 758 F. App'x 165, 167 (2d Cir. 2019) (summary order) (quoting District of Columbia v. Wesby, 138 S. Ct 577, 586 (2018);  Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) (internal quotation marks omitted)).  "Probable cause is, of course, evaluated on the totality of the circumstances." Jenkins v. City of N.Y., 478 F.3d 76, 90 (2d Cir. 2007) (citations omitted).

Furthermore, "[p]robable cause is to be assessed on an objective basis. 'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). "[A]n arresting officer's state of mind (*except for the facts that he knows*) is irrelevant[.]" Zellner, 494 F.3d at 369 (quoting Whren v. U.S., 517 U.S. 806, 812-13 (1996). "[A]n officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" Zellner, 494 F.3d at 369 (citations omitted); cf. Livingston v. Hoffnagle, 9:19-CV-353 (GLS/CFH), 2019 WL 7500501, at *4 n. 7 (N.D.N.Y. Nov. 8, 2019) (collecting cases) report-recommendation adopted by 2020 WL 95431 (N.D.N.Y. Jan. 8, 2020) (discussing that a Fourth Amendment claim, ". . .unlike the Eighth Amendment standard that includes both objective and subjective elements, is an 'exclusively objective analysis' under which the defendant's 'intent is irrelevant.'").

An officer does not have a "duty . . . to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification[.]" Jocks v. Tavernier, 316 F.3d 128, 135-36 (2d Cir. 2003). However, the Second Circuit has recognized that "the failure to make a further inquiry when a reasonable person would have done so" may show that the conduct was unjustified. Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010) (quotations omitted); see also Jocks, 316 F.3d at 136. Moreover, the assessment need not be based on the knowledge of a single officer. Zellner, 494 F.3d at 369; see U.S. v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) ("[A]n arrest . . . is permissible where the actual arresting officer

19

or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."); U.S. v. Valez, 796 F.2d 24, 28 (2d Cir. 1986) cert denied 479 U.S. 1067 (1987) ("[I]n light of the complexity of modern policework, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates.").

"In some circumstances, however, police may detain without probable cause to arrest."  Mayes, 162 F. Supp. 3d at 86 (collecting cases).  "[A]n 'investigative detention' or a 'Terry stop,' employs 'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time' and can be supported by reasonable suspicion, instead of probable cause."  Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983) (citations omitted)); see also Terry v. Ohio, 392 U.S. 1, 30 (1967).  An officer has "reasonable suspicion to justify an investigatory stop if there is 'a reasonable basis to think that the person to be detained is committing or has committed a criminal offense.'"  Lee v. City of Troy, 520 F. Supp. 3d 191, 210 (N.D.N.Y. 2021) (quoting U.S. v. Singletary, 798 F.3d 55, 59 (2d Cir. 2015) (internal citations and quotation marks omitted)).   "As language like 'a reasonable basis' suggests, reasonable suspicion is not a high standard to meet.'"  Id.; see, e.g., Singletary, 798 F.3d at 60 (stating that a Terry stop requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity 'may be afoot.'") (quoting U.S. v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014); Terry, 392 U.S. at 30); see also U.S. v. Padilla, 548 F.3d 179, 186-87 (2d Cir. 2008) (stating that reasonable suspicion requires

"less than a fair probability of wrongdoing, and considerably less than. . . a preponderance of the evidence") (internal quotation marks omitted).  "[C]onduct that is as consistent with innocence as with guilty may form the basis for an investigative stop where there is some indication of possible illicit activity."  Padilla, 548 F.3d at 187.

"There is no bright line rule differentiating an arrest from a detention supported by less than probable cause."  Posr, 944 F.2d at 98 (citing Royer, 460 U.S. at 506).  "A *Terry* stop requiring reasonable suspicion may ripen into a *de facto* arrest requiring probable cause 'if the means of detention are more intrusive than necessary.'" Hathorne by Hathorne v. Cnty. of Putnam, 492 F. Supp. 3d 281, 295 (S.D.N.Y. 2020) (quoting U.S. v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) (citations and internal quotations omitted).  "In assessing whether the degree of restraint was 'too intrusive to be classified as an investigative detention,'. . . [the Second Circuit has] considered in general the amount of force used by police, the need for such force, and the extent to which an individual's freedom of movement was restrained[.]"  U.S. v. Perea, 986 F.2d 633, 645 (2d Cir. 1993) (internal quotations and citations omitted).  Additionally, the Second Circuit has considered ". . . particular such factors as the number of agents involved[;] whether the target of the stop was suspected of being armed[;] the duration of the stop[;] and the physical treatment of the suspect[,] including whether or not handcuffs were used[.]  Id.  (internal quotations and citations omitted); see also Grice v. McVeigh, 873 F.3d 162, 167 (2d Cir. 2017) ("Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest."); U.S. v. Newton, 369 F.3d 656, 676 (2d Cir. 2004) (citations omitted) (stating, for purposes of Miranda, "[h]andcuffs are generally recognized as a hallmark of a formal arrest.").

21

In any event, "[e]ven where actual probable cause does not exist, an officer may be entitled to qualified immunity on a § 1983 false arrest claim if his actions were objectively reasonable or if 'arguable probable cause' existed at the time of the arrest." Triolo v. Nassau Cnty., 24 F.4th 98, 107 (2d Cir. 2022) (quoting Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016) (citations omitted)).  "A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  Figueroa, 825 F.3d at 100 (internal quotation marks omitted).  "'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause."  Jenkins, 478 F.3d at 87.  "The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed."  Id. (citations omitted); see also Triolo, 24 F.4th at 108 (quoting Figueroa, 825 F.3d at 100) ("The question is 'not whether the officer *should have* acted as he did.'").[4]

In several instances throughout plaintiff's brief, he argues that Trooper Lubrant acted with an improper motive or "rationale" for detaining and/or arresting plaintiff, claiming that Trooper Lubrant acted with "actual malice."  Dkt. No. 46 at 14, 18-20.  He argues that Trooper Lubrant placed him into custody "because he committed the

---

[4] In New York, qualified immunity is similarly applicable to state law false arrest claims.  See Hogan v. Lewis County, No. 7:16-CV-1325 (LEK/ATB) 2018 WL 4689094, *20 (N.D.N.Y. Sept. 28, 2008) (discussing application of qualified immunity to New York false arrest claims); Jenkins, 478 F.3d at 86-7 & n. 8 (2d Cir. 2007) (acknowledging both federal and New York qualified immunity doctrines look at whether probable cause determination was "*objectively* reasonable"); Sanchez v. Port Auth. Of N.Y. and N.J., 2012 WL 1068078, at *10 n. 7 (E.D.N.Y. Mar. 29, 2012) (noting that New York law recognizes a similar qualified immunity as applicable to federal law claims, and that "[w]here qualified immunity applies to federal false arrest and malicious prosecution claims, it is also generally appropriate to dismiss state analogs.").

cardinal sin of asking for a lawyer." Id. at 19.  However, false arrest claims are assessed under an objective reasonableness standard, without regard to any alleged subjective motivations; thus, any claim of a malicious or retaliatory motive is irrelevant to the analysis, so long as an objectively reasonable basis existed.  See Zellner, 494 F.3d at 369 (citations omitted) (stating that the "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

The parties agree that plaintiff was restrained and placed into custody without his consent.  See Dkt. No. 41-1 at 4 ¶¶ 21-22; Dkt. No. 47 at 7-8 ¶¶ 21-22.  Defendants contend that they "temporarily detain[ed]" plaintiff.  Dkt. No. 41-10 at 13-15.  Plaintiff asserts that it was an "arrest" made without "probable cause."  Dkt. No. 46 at 17. Notwithstanding, both parties address the alternative contentions, with defendants asserting that, even assuming plaintiff was arrested, probable cause supported taking him into custody, and plaintiff arguing that, in any event, there exist too many disputed facts to support even a reasonable suspicion finding.  See Dkt. No. 41-10 at 13-15; Dkt. No. 46 at 18-20; Dkt. No. 48 at 8-9.

Plaintiff contends that he had a "clearly established right to remain silent" and that his refusal to cooperate cannot be a basis for a detention or an arrest.[5]  Dkt. No. 46 at 20.  Plaintiff admits that ". . . [he] was cooperative until Trooper Lubrant accused him of assaulting Jason."  Dkt. No. 47 at 6, ¶¶ 18-19.  Although it is well-established ". . . that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure[,]" where an officer has reasonable

---

[5] The Court notes that plaintiff similarly framed this contention as a separate cause of action under the First Amendment, which he has withdrawn.  See Am. Compl. at 12-14, ¶¶ 77-82; Dkt. No. 46 at 19.

suspicion justifying a <u>Terry</u> stop based on other circumstantial factors, recent Supreme Court law indicates that a suspect's subsequent refusal to cooperate may be factored into a probable cause determination.  <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991) (collecting cases); <u>see</u> <u>also</u> <u>Nieves v. Bartlett</u>, 139 S. Ct. 1715, 1724 (2019) (stating "[o]fficers frequently must make 'split-second judgments' when deciding whether to arrest, and the content and manner of a suspect's speech may convey vital information—for example, if he is 'ready to cooperate' or rather 'present[s] a continuing threat.'") (quoting <u>Lozman v. Riveria </u>Beach, 138 S. Ct. 1945, 1953 (2018) (citations omitted)).

By comparison, the Supreme Court has noted in First Amendment "retaliatory arrest" cases ". . . that protected speech is often a legitimate consideration when deciding whether to make an arrest[.]"  <u>Nieves</u>, 139 S. Ct. at 1724 (citing <u>Reichle v. Howards</u>, 556 U.S. 658, 668 (2012); <u>Lozman</u>, 138 S. Ct. at 1953); <u>see</u> <u>also</u> <u>Hawthorne by Hawthorne v. Cnty. of Putnam</u>, 492 F. Supp. 3d 281, 303 (S.D.N.Y. 2020) (discussing on alternative grounds that the defendant-officers ". . . would be entitled to qualified immunity because 'it was not clearly established that an individual has a First Amendment right to refuse to answer an officer's questions during a *Terry* stop.'") (quoting <u>Koch v. City of Del City</u>, 660 F.3d 1228, 1244 (10th Cir. 2011) (citations omitted)); <u>Lederman v. Benepe</u>, 2014 WL 1318356, at *9 (S.D.N.Y. Mar. 28, 2014) ("Where there is probable cause to believe that a plaintiff has committed a crime, however, the case law indicates that First Amendment interests must yield[.]"). Although a refusal to answer questions has generally been considered in the First Amendment context, this Court has also considered a plaintiff's uncooperativeness

24

when determining whether probable cause existed for a false arrest claim.  See Hogan v. Buttofocco, No. 1:07-CV-0731 (NAM/DRH), 2009 WL 3165765, at *6-8 (N.D.N.Y. Sept. 28, 2009) (factoring into false arrest probable cause determination the plaintiff's uncooperativeness and refusal to answer officers' questions following 911 domestic disturbance call).  Thus, it cannot be said that plaintiff had a "clearly established right to remain silent" in the context of a Terry stop, or that his refusal to answer questions could not be a basis for his detention or arrest.  Dkt. No. 46 at 20.  Notwithstanding, plaintiff's argument in this respect is misplaced as his Fourth Amendment false arrest claim does not concern a right to refuse cooperation or remain silent, but rather his constitutional right to be free from arrest absent probable cause.  See Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002) (stating that "§ 1983 claim for false arrest derives from an individual's right to remain free from unreasonable seizures.  This includes the right to remain free from arrest absent probable cause.") (citations omitted).

Plaintiff also argues that defendants are not entitled to qualified immunity as to his false arrest claim because "[n]o officer would reasonably believe it is appropriate to handcuff someone because they asserted their right to counsel."  Dkt. No. 46 at 14, 18-19.  However, although plaintiff had a clearly established right under the Sixth Amendment to invoke the assistance of counsel, there is no allegation that defendants violated this right.  See generally Am. Compl.; see also O'Hagan v. Soto, 725 F.2d 878, 879 (2d Cir. 1984) (acknowledging that ". . . the Sixth Amendment right to counsel is well established[.]").  Instead, plaintiff's claim concerns his Fourth Amendment right to be free from arrest without probable cause.  See Dkt. No. 46 at 19-20; see also Jenkins, 478 F.3 at 87-88 (discussing that qualified immunity in false arrest cases concerns ". . .

the right to be free from arrest without probable cause[.]").  As discussed above, probable cause is assessed objectively, without regard to defendants' subjective motivations; thus, plaintiff's claim that defendants violated a clearly established right in this respect is inapposite.  See Zellner, 494 F.3d at 369 (quoting Whren, 517 U.S. at 812-13) ("[A]n arresting officer's state of mind (*except for the facts that he knows*) is irrelevant[.]").

The undisputed facts indicate that defendants had reasonable suspicion to initiate at least a Terry stop of plaintiff—to wit:  defendants were responding to an EMS assistance call concerning a 911 report of a "possible assault."  Dkt. No. 41-8 at 1; Dkt. No. 41-6 at 10; Dkt. No. 41-7 at 7-8; Dkt. No. 45-3 at 42-43.  After defendants arrived Jason Hayes told Trooper Fish that he fell and hit his head, even though he was suspected of having been assaulted.  Dkt. No. 41-1 at 3, ¶ 13; Dkt. No. 47 at 3 ¶ 13. The parties agree that no witnesses saw how Jason was injured, and that the undisputed record informs the belief that Jake assaulted his father and fled the scene prior to defendants' arrival.  See Dkt. No. 47 at 10, ¶ 46; Dkt. No. 48-1 at 1, ¶ 46; Dkt. No. 46 at 6.  However, excluding Jason, the only non-emergency or police personnel on scene were plaintiff, his two sons, and his grandson.  See Dkt. No. 41 at 3, ¶10; Dkt. No. 47 at 2, ¶ 10.  Out of these four individuals, plaintiff was the only one observed with blood on him—blood that undisputedly came from Jason's injuries.  See Dkt. No. 47 at 3-4, ¶ 14; Dkt. No. 41-5 at 30-31.  Thus, even in the absence of a specific accusation implicating plaintiff in any wrongdoing, it was reasonable to initiate an investigatory detention of plaintiff to find out how he got Jason's blood on him and what involvement, if any, plaintiff had in the 911 possible assault report that brought law enforcement to

26

the scene.[6]  See Hodges, 2010 WL 11530515, at *8-9 (E.D.N.Y. Jul. 2, 2010) reversed
and remanded on other grounds 425 F. App'x 33 (2d Cir. 2011) (summary order).

While the above-discussed undisputed facts support a reasonable suspicion
finding, there is a material factual dispute as to whether the degree of restraint was "too
intrusive to be classified as an investigative detention[,]" and at what point, if at all, the
Terry stop ripened into a de facto arrest.  Perea, 986 F.2d at 645 (citations omitted).
Most importantly, the parties dispute the amount of force used and whether force was
necessary at all.  See Dkt. No. 41-1 at 4-5, ¶¶ 22, 24-26, 33-34; Dkt. No. 47 at 8-10, ¶¶
22, 24-26, 33-34; see also Perea, 986 F.2d at 645 (stating that general factors to
consider include ". . . the amount of force used by police, the need for such force, and
the extent to which an individual's freedom of movement was restrained[.]") (internal
quotations and citations omitted).  Moreover, there are disputed factual contentions as
to whether Trooper Lubrant discovered any supposed "trail of blood" or "a bloody
hammer," and whether plaintiff was "highly intoxicated" and/or "fleeing the scene."  Dkt.
No. 41-10 at 14-15; Dkt. No. 46 at 8-10; Dkt. No. 41-1 at 3-4, ¶¶ 15-21; Dkt. No. 47 at 4-
7, ¶¶ 15-21.  These factual contentions are relevant to determining whether plaintiff
presented any alleged safety and/or flight risks that justified placing him in handcuffs,

---

[6] Notably, the record indicates that prior to detaining plaintiff, defendants may have briefly interacted with
plaintiff's sons, who related that, based on what plaintiff said, Jason had been hit in the head by Jake.
See Dkt. No. 45-2 at 22-23; Dkt. No. 45-3 at 47-49; Dkt. No. 45-8 at 2, ¶ 3.  For the purposes of this
motion, the Court assumes this to be true, but nonetheless finds the initial Terry stop was warranted
considering that no eyewitnesses reported seeing Jake hit Jason, and that plaintiff was the only potential
suspect observed on scene with blood on him.  See, e.g., Hodges, 2010 WL 11530515, at *8-9
(explaining that a Terry stop was warranted where the plaintiff was observed on scene in a "torn and
bloodied shirt," even though the 911 caller specifically informed the defendant-officers that the plaintiff
was not the aggressor); Jocks, 316 F.3d at 135-36 (stating that there is no duty ". . . to investigate
exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims
of justification before making an arrest.").

which may have transformed the investigative stop into an arrest.  See Grice v. McVeigh, 873 F.3d 162, 167 (2d Cir. 2017) (quoting U.S. v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990)) ("Handcuffing is ordinarily not incident to a Terry stop, and tends to show that a stop has ripened into an arrest.  But a police officer, 'faced with the possibility of danger, has a right to take reasonable steps to protect himself . . . regardless of whether probable cause to arrest exists.'").  Thus, whether plaintiff's detention ripened into an arrest, and, if so, whether defendants had arguable probable cause as to warrant qualified immunity from suit, require the resolution of factual disputes best left for a jury to decide.[7]  See Singletary v. Allen, No. 18-CV-1023 (EAW/LGF), 2022 WL 610621, at *8 (N.D.N.Y. Mar. 4, 2022) (denying summary judgment "[b]ecause [inter alia] there are material issues of fact as to whether [the p]laintiff was arrested[.]").

Accordingly, there are disputed material facts precluding summary judgment as to plaintiff's false arrest claims.

---

[7] Although not addressed by either party, "the duration of the stop" is a factor relevant to determining whether plaintiff's detention ripened into an arrest.  Perea, 986 F.2d at 645 (citations omitted); see, e.g., U.S. v. Sharpe, 470 U.S. 675, 688 (1985) ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains."); U.S. v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) ("We decline to hold that a thirty minute detention based on a reasonable suspicion is, per se, too long.").  While the undisputed record shows that defendants arrived at approximately 2:00 AM and that by at least 3:15 AM they had left the scene, the record is unclear as to how long plaintiff was in custody.  See Dkt. No. 41-1 at 2, 6 ¶¶ 8, 39; Dtk. No. 41 at 2 ¶¶ 8, 39; Dkt. No. 41-3 at 3-4, ¶¶ 12-13; see also U.S. v. Place, 462 U.S. 696, 703 (1983) ("[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case.").

### 3.  Excessive Force and Assault & Battery

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest."  Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).  "Federal excessive force claims and state law assault and battery claims against police officers are nearly identical."  Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 491 (N.D.N.Y. 2017) (quoting Graham v. City of N.Y., 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) (citations and internal quotations marks omitted)).  "For either type of claim to succeed," the plaintiff must demonstrate that the force applied was "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  Hulett, 253 F. Supp. 3d at 491 (quoting Hershey v. Goldstein, 938 F.Supp.2d 491, 519 (S.D.N.Y. 2013) (citations omitted)).

The objective reasonableness determination involves "careful attention to the facts and circumstances of each particular case."  Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (citing Graham, 490 U.S. at 397).  This analysis considers: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  Tracy, 623 F.3d at 96 (citing Graham, 490 U.S. at 396; Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)).

"Importantly, a court must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Hulett, 253 F.Supp. at 491 (citations omitted).  Thus, the Court must "make 'allowance for the fact that police officers are often forced to make split-second judgments—in

29

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Jones, at 465 F.3d at 61 (quoting Graham, 490 U.S. at 396). "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, and other exigent circumstances." Hulett, 253 F. Supp. 3d at 492 (quoting Lin v. Cnty. of Monroe, 66 F. Supp. 3d 341, 358 (W.D.N.Y. 2014) (citations and internal quotation marks omitted)).

In support of their motion, defendants acknowledge that Trooper Lubrant used force on plaintiff when he placed him in handcuffs and escorted him to the patrol car. See Dkt. No. 41-10 at 11-12. Although they concede that plaintiff fell as he was being escorted, defendants contend this occurred because he tripped on his pants as they fell to his ankles. Id. Defendants assert that Trooper Lubrant did not "lift [plaintiff] up by his handcuffs"; rather, Trooper Lubrant grabbed him by his arms when helping him up. Id. at 12. Similarly, they aver that Trooper Lubrant neither "hit" plaintiff nor "thr[e]w him against the patrol car." Id.

In opposition, plaintiff cites admissible record evidence supporting his claim that Trooper Lubrant "handcuffed him and dragged him to the patrol car." Dkt. No. 46 at 13; Dkt. No. 45-2 at 24-25; Dkt. No. 45-5 at 11; Dkt. No. 45-4 at 31; Dkt. No. 45-8 at 2-3, ¶¶ 5-6. Specifically, he adduces witness testimony indicating "that Trooper Lubrant handcuffed him behind his back, lifted him up by the handcuffs causing him pain, knocked him down on his face, picked him up by the handcuffs, wrists or forearms breaking his arm and dislocating his elbow, and then dragged to the patrol car." Id. Moreover, he cites testimony from his son, Robert J. Snyder, who stated that he saw Trooper Lubrant bang plaintiff's shoulder into the car as Trooper Lubrant attempted to

place plaintiff inside. See id. at 10; Dkt. No. 45-2 at 30.  Accordingly, the Court finds that

the parties dispute the nature of the force underlying plaintiff's claims, and that

"[d]eciding which version of events to believe requires a credibility determination that is

best left to a jury." Jennings v. Decker, No. 5:17-CV-54 (LEK/TWD), 2021 WL 3471557,

at *8 (N.D.N.Y. Aug. 6, 2021).

Notwithstanding the parties' evident dispute as to the nature of the force applied,

there are material issues of fact as to the events preceding the alleged use of force that

would factor into the reasonableness determination.  See Jennings, 2021 WL 3471557,

at *8 (denying summary judgment where parties disputed the nature of the force used

and whether plaintiff posed a safety threat, actively resisted, and/or attempted to evade

arrest by flight).  For instance, plaintiff disputes he was "highly intoxicated" or trying to

"flee the scene."  Dkt. No. 46 at 15; Dkt. No. 45-8 at 3, ¶ 7; Dkt. No. 47 at 7, ¶ 20.

Plaintiff disputes that Trooper Lubrant discovered a "trail of blood" or "bloody hammer"

in the shed on plaintiff's property, which may have factored into any perceived threat

from plaintiff.  Dkt. No. 46 at 9; Dkt. No. 47 at 4, ¶¶ 15-16.  As such, there are material

factual disputes relevant not only to the nature of force used on plaintiff, but also to

whether plaintiff "pose[d] an immediate threat to the safety of the officer or others" and

whether plaintiff "was actively resisting arrest or attempting to evade arrest by flight."

Tracy, 623 F.3d at 96 (citing Graham, 490 U.S. at 396) (citations omitted).

Consequently, the Court finds that there are material issues of fact precluding summary judgment on plaintiff's Section 1983 excessive force claim and the state law assault and battery claims.[8]

### 4. Failure to Intervene

"A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to prevent it." Figueroa v. Mazza, 825 F.3d 89, 106 (2d Cir. 2016). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." Hicks v. Craw, 405 F. Supp. 3d 374, 386 (N.D.N.Y. 2019) (quoting Figueroa, 825 F.3d at 106 (citations omitted)). "An officer who fails to intercede in the use of excessive force. . . is liable for the preventable harm caused by the actions of other officers." Terebesi v. Torreso, 764 F.3d 217, 243 (2d Cir. 2014) (citation omitted). "Whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." Figueroa, 825 F.3d at 107. "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence a reasonable jury could not

---

[8] Like plaintiff's false arrest claims, given the existence of a material factual dispute as to any remaining claims, the Court declines to rule on the application of qualified immunity at this time. See Jones v. Parmley, 564 F.3d 46, 54 (2d Cir. 2006) (affirming district court's decision not to rule on qualified immunity where ". . . disputed factual issues remained to be resolved before the court could rule on the qualified immunity issue."). Nonetheless, defendants will be permitted to renew their request for qualified immunity should they be found liable on any of the remaining claims. See West v. Harkness, 9:17-CV-0621 (GTS/DJS), 2021 WL 4289515, at *16 n. 24 (N.D.N.Y. Sept. 21, 2021).

possibly conclude otherwise.'"  Terebesi, 764 F.3d at 244 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).

Defendants ague that plaintiff's complaint did not plead a Section 1983 failure to intervene claim as to Trooper Fish, arguing that the claim shows up for the first time in plaintiff's opposition papers.  See Dkt. No. 48 at 5.  Defendants' reply memorandum nonetheless addresses the merits of such a claim, arguing that Trooper Fish had no realistic opportunity to intervene, even assuming that Trooper Lubrant violated a constitutional right.  Id. at 5-6.

Plaintiff's Amended Complaint contains seven numbered subheadings concisely setting forth his causes of action with a short and plaint statements asserting entitlement to relief.  See Dkt. No. 1 at 8-16, ¶¶ 60-105; Am. Compl. at 9-17, ¶¶ 60-105.  In a preceding paragraph, under the subheading titled "Factual Allegations," plaintiff asserts that "Trooper Fish observed the entire interaction between Defendant Trooper Lubrant and Mr. Snyder and did not intervene to stop Defendant Lubrant from unlawfully arresting, detaining or assaulting Mr. Snyder despite his duty to do so."  Am. Compl. at 6, ¶ 35.  Likewise, in another paragraph he asserts that "Trooper Fish observed the illegal manner in which Defendant Lubrant violently battered and threw Mr. Snyder into the side of the State Police Vehicle multiple times and did nothing to intervene on Mr. Snyder's behalf as was their duty to do."  Id. at 8, ¶ 52.  These words signal a failure to intervene cause of action, which, practically speaking, is often brought with a primary excessive force claim involving multiple officer-defendants.  See Hicks v. Craw, 405 F. Supp. 3d 374, 385 (N.D.N.Y. 2019); Case v. City of N.Y., 233 F. Supp. 3d 372, 401-02 (S.D.N.Y. 2017) (discussing that a failure to intervene claim is contingent upon the

disposition of the "primary claims" asserted) (citations omitted).  Accordingly, although "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint[,]" the Court finds that plaintiff's pleadings sufficiently stated a failure to intervene claim against Trooper Fish relative to Trooper Lubrant's use of force. Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (citing Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (collecting cases)).

The Court further finds that material issues of fact remain as to whether Trooper Fish had a "realistic opportunity" to intervene.  Terebesi, 764 F.3d at 244 (quoting Anderson v. Branen, 17 F.3d at 557).  First, as discussed above, the Court has already found a material factual dispute concerning Trooper Lubrant's alleged use of force.  See Jeanty v. City of Utica, No. 6:16-CV-966 (BKS/TWD), 2021 WL 149051, at *31 (N.D.N.Y. Jan. 14, 2021) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim.") (quoting Matthews v. City of N.Y., 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012) (internal quotations omitted)); see also Martinez v. City of N.Y., 2021 WL 4502440, at *12 (E.D.N.Y. Sept. 30, 2021) (granting and denying summary judgment, in part, as to multiple failure to intervene claims contingent upon disposition of primary claims of excessive force.); John v. City of N.Y., 406 F. Supp. 3d 240, 246 (E.D.N.Y. 2017) (denying summary judgment on failure to intervene claim and qualified immunity, stating "[t]he Court cannot determine whether excessive force was excessive force was used and therefore cannot determine whether any of the Officer Defendants failed to intervene to prevent the deprivation of Plaintiff's constitutional rights.") (citations

omitted).  Second, assuming Trooper Lubrant violated plaintiff's constitutional rights, the record is unclear as to Trooper Fish's relative placement in proximity to where the alleged use of force occurred, and how, if at all, he purportedly "shadow[ed]" Trooper Lubrant, as plaintiff contends.  Dkt. No. 46 at 16; Dkt. No. 45-1 at 39.  As such, defendants' motion for summary judgment as to plaintiff's Section 1983 failure to intervene claim is denied.

### 5.  Negligence

Rule 8(d)(3) of the Federal Rules of Civil Procedure permits plaintiffs to 'plead two or more statements of a claim. . . regardless of consistency.'" Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999) (quoting Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994) (discussing former Rule 8(e)(2)).  This "flexibility. . . is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims."  Id.  Even where allegations are "not specifically pleaded as 'in the alternative,'" the Second Circuit has ruled that "sufficient latitude" may be afforded ". . . to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party. . . for summary judgment."  Adler, 185 F.3d at 41 (citations omitted).

Defendants argue that plaintiff's Seventh Cause of Action for state law negligence must be dismissed because the conduct at-issue is alleged to have been intentional, and that if intentional offensive conduct is established, Trooper Lubrant is liable for assault, not negligence.  See Dkt. No. 41-10 at 23-24.  Whether or not defendants are correct in this regard, plaintiff has yet to establish the type and degree of

conduct because there are material issues of fact relative to any purported intentional claims, thereby precluding summary judgment.  The undersigned notes that defendants admit Trooper Lubrant intentionally used force on plaintiff when handcuffing him and escorting him to the patrol vehicle; however, defendants dispute that any subsequent use of force ever occurred.  See Dkt. No. 41-3 at 4-5, ¶¶ 14-18.  Based on plaintiff's allegations—namely, that Trooper Lubrant caused plaintiff's fall to the ground, lifted plaintiff up by his wrists or handcuffs, dragged plaintiff to the patrol car, and repeatedly banged plaintiff's shoulder into the side of the vehicle—the Court finds it conceivable that such actions, if accepted as true by a jury, were the result of negligent, not intentional, behavior.  See Am. Compl. at 9-11; 17-18, ¶¶ 60-65; 100-105.  Considering that Rule 8(d) permits pleading in the alternative, plaintiff may proceed to trial with two inconsistent claims.  Defendants' motion seeking dismissal of plaintiff's state law negligence claim is denied.

### 6.  Supplemental Jurisdiction

Section 1367(c) provides that:

The district course may decline to exercise supplemental jurisdiction over a claim under [§ 1367(a)] if –

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

36

28 U.S.C. § 1367(c).  If one of the § 1367(c) categories applies, the district court may then undertake the discretionary inquiry of whether to exercise supplemental jurisdiction.  See Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018).

The Court rejects defendants' request to decline the exercise of supplemental jurisdiction over plaintiff's remaining state law claims.  As set forth above, plaintiff has viable federal causes of action remaining pursuant to 28 U.S.C. § 1983.  Further, plaintiff's state law claims do not meet the Section 1367(c) criteria.  Accordingly, the Court extends supplemental jurisdiction over plaintiff's state law claims is denied.


## V.  Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that defendants' motion for summary judgment (Dkt. No. 41) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED**, that any claim against defendants in their official capacity is **DISMISSED** with prejudice as to both defendants; and it is further

**ORDERED**, that plaintiff's Section 1983 excessive force claim and his state law claims for assault and battery remain as to defendant Christopher Lubrant in his individual capacity; and it is further

**ORDERED**, that plaintiff's Section 1983 failure to intervene claim remains as to defendant William Fish in his individual capacity; and it is further

37

**ORDERED**, that plaintiff's Section 1983 and state law false arrest claims and his state law negligence claims remain as to both defendants in their individual capacities; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: May 27, 2022
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge